**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| POWERWEB ENERGY, INC., | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | 3:12CV220 (WWE) |
| | : | |
| HUBBELL LIGHTING, INC. and | : | |
| HUBBELL BUILDING AUTOMATION, | : | |
| Defendants. | : | |

**MEMORANDUM OF DECISION ON PLAINTIFF'S MOTIONS IN LIMINE AND
DEFENDANTS' MOTIONS FOR FOR SUMMARY JUDGMENT**

This action concerns agreements made between plaintiff Powerweb Energy, Inc.

("Powerweb") and defendants Hubbell Lighting, Inc. ("HLI") and Hubbell Building

Automation ("HBA") (collectively, defendants) relative to a project to design, develop

and manufacture certain lighting components and equipment.  Plaintiff asserts claims of

breach of contract, breach of implied duty of good faith and fair dealing, unjust

enrichment, violation of the Connecticut Uniform Trade Secrets Act ("CUTSA"),

misappropriation of idea, conversion, breach of fiduciary duty, and violation of the

Connecticut Unfair Trade Practices Act ("CUTPA").

Defendants have filed two separate motions for summary judgment on liability

and on plaintiff's claim for lost profits, respectively.  Plaintiff has filed motions in limine

regarding expert testimony by Patrick Kinney and Suzanne Buckley.  For the following

reasons, the motions in limine will be denied; the motion for summary judgment on

liability will be granted in part and denied in part; the motion for summary judgment on

plaintiff's claim for lost profits will granted.

1

## I.  BACKGROUND

The parties have submitted statements of fact with supporting exhibits and affidavits that reflect that the following material facts are not in dispute.  However, a large portion of defendants' undisputed facts are contested by plaintiff due to the context of the witness's statement or contractual terms.

Powerweb is a privately held corporation that designs products and services in the energy management and controls technology arena.  Lothar Budike is Powerweb's founder, president and sole shareholder.

HLI operates a lighting fixture business, managing twenty-four fixture brands. HBA controls business, development and sales of products such as occupancy sensors, light harvesting sensors and lighting control systems.  In January 2009, HBA came under the operational control of HLI.

On April 3, 2007, Powerweb entered into a Mutual Confidentiality Agreement ("Non Disclosure Agreement") with HLI to facilitate the parties' exchange of information necessary for the design, development and manufacture of certain lighting components and equipment.  According to the Non Disclosure Agreement, HLI and Powerweb were independent contractors.

In November 2008, Powerweb and defendants entered into an Exclusive Supply, Purchase and License Agreement ("License Agreement") related to the development of a wireless product known as the "Atrium" concept.  The parties agreed that the License Agreement was governed by Connecticut law.

The License Agreement defined "Powerweb Technology" as "all technical information, specifications, quality control techniques, test methods, practices,

2

knowledge, know-how, skills, experience, trade secrets and other proprietary or

confidential information relating to the design, development and manufacture of the

lighting control technology . . ., which Powerweb now possesses, later develops or later

acquires."  "Intellectual Property" was defined as "the Improvements, the Patent Rights

and Powerweb Technology."  "Products" was defined as "embodying the POWERWEB

technology disclosed in the Patent Rights . . . and all new Products developed by

POWERWEB in accordance with the specifications confirmed and agreed upon

between [the Parties]; and "Licensed Products" as defendants' "light fixtures or sensors

wherein the Products have been integrated or where the Products have been combined

with the said fixtures or senors in any other manner."

Defendants agreed to pay certain royalties on the Products and Licensed

Products.

At paragraph 10.1, the License Agreement provided the following confidentiality

agreement:

> [The Parties] agree that during the Term of this Agreement each will
> disclose to the other information including without limitation trade secrets
> and other proprietary information marked as "Confidential" or, if disclosed
> orally, described as "Confidential" by the disclosing Party (the
> "Confidential Information") regarding matters dealing with actions
> necessary to carry out the terms of this Agreement.  Each Party agrees
> that they will keep the other Party's Confidential Information and all
> related matters confidential and prevent disclosure of said Confidential
> Information by its agents, employees or representatives.  Neither Party
> shall disclose the other Party's Confidential Information to any other
> person or entity without their prior written consent of the disclosing Party.
> Each Party shall safeguard the Confidential Information of the other Party
> with at least the same degree of care with which it guards its own
> Confidential Information, but in no event exercise less than a reasonable
> standard of care.  The recipient shall use the Confidential Information only
> for the purposes of performing its obligations under this Agreement.

However, certain information was not deemed confidential, including information publically known, information known by the receiver prior to the disclosure, information disclosed by a third-party, information that is required to be disclosed by law, information developed independently by the receiving party, and information approved for release by written authorization.

Paragraph 22 provided that the terms of the agreement "which by their nature extend beyond the expiration, termination or cancellation of this Agreement shall remain in full force and effect until fulfilled and/or performed and shall inure to the benefit of and be binding upon [the Parties] and their respective successors and assigns."

In January 2009, HBA hosted a project kickoff meeting in Austin. The parties exchanged numerous drafts of technical specifications for the Atrium wireless product, which would be branded as Wi-Con. In May 2009, the Wi-Con concept was introduced at the Lightfair industry trade show. HBA distributed the features of Wi-Con at this event, which was open to the public. HBA's booth displayed a mock-up that consisted of a simple controller that wirelessly operated a bank of lights.

Subsequently, Wi-Con presentations were made to JP Morgan Chase Bank, the Department of General Services of the Commonwealth of Pennsylvania and New York lighting distributor Christopher Brown. The parties dispute the extent of the WI-Con installation, its accessibility to the public during the presentations and the extent that the confidentiality agreement covered the individuals who had been given access to the display.

4

On December 2010, Powerweb and defendants entered into an Expanded Exclusive Supply, Purchase and License Agreement ("Expanded License Agreement") as of the same effective date as the previous License Agreement (November 12, 2008). The parties appear to dispute the effect of the Expanded License Agreement on the confidentiality provisions.  However, it is undisputed that defendants were granted a license to use plaintiff's technology and improvements and that defendants were required to pay royalties for such use.

Budike, Powerweb's president, obtained several patents related to the Wi-Con technology.  The patents described the Wi-Con technology, but the parties dispute whether the patents disclosed the technical components of Wi-Con or reflect generic descriptions without compromising confidential trade secret information.[1]

In early 2011, Powerweb demanded advances to pay for additional redesign work.  However, the parties reached an impasse as to defendants' payment for the work.

In June 2011, Budike learned that defendants had developed their own product known as wiHUBB.  Defendants' system included hard-wired switches, sensors, power modules and fixtures to a central control panel that could be accessed through the internet.  The primary components of Wi-Con include (1) a ballast interface module, (2)

---

[1]Defendants also cite to articles that they assert discuss technology similar to that used for Wi-Con.  However, plaintiff disputes the similarities of its technology and that discussed.  As to the progress report, "Adapting Wireless Technology to Lighting Control and Environmental Sensing," plaintiff objects to its use as hearsay and maintains that it was not published to the public.  Even considering these articles in its assessment of undisputed facts, the Court cannot assess as a matter of law whether plaintiff's alleged proprietary information was already publically-accessible information.

a receiver, (3) a wireless switch station, (4) a sensor transmitter, and (5) an internet access module.

Powerweb claims damages, including lost profits based on projected profits of $16 million in the first year and $47.8 million in the third year.  Powerweb's lost profits model assumes that millions of Hubbell fixtures would be ungradable and offered for sale with Wi-Con.

## II.  MOTIONS IN LIMINE

Plaintiff seeks to limit or exclude the expert opinions by Patrick Kinney and Suzanne Buckley.

The district court has a "gatekeeping" role pursuant to Federal Rule of Evidence 702 and is charged with ensuring that an expert's testimony rests on a reliable foundation and is relevant to issues presented in the case.  Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002).  A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.  Fed. R. Evid. 702.

The Court should consider (1) whether a theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) a technique's known or potential rate of error, and the existence

and maintenance of standards controlling the technique's operation, and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community.  Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993); Amorgianos, 303 F.3d at 266.  The burden is on the party proffering the expert testimony to lay a foundation for its admissibility, and a court must consider the totality of the expert witness's background when evaluating expert qualifications.  Kuzmech v. Werner Ladder Co., 2012 WL 6093898, *7 (D. Conn. 2012).  An expert qualified in a general field closely related to the litigation at issue need not be a specialist in a certain speciality area to render an expert opinion assisting the trier of fact.  See Stagl v. Delta Air Lines, Inc., 117 F.3d 76, 81-82 (2d Cir. 1997) (error to exclude well trained expert with qualifications in general field rather than specific area).

Plaintiff maintains that Kinney is not a competent expert on wireless lighting control systems.  However, upon review of the evidence, the Court finds that Kinney retains appropriate expertise as an electrical engineer with experience working with wireless lighting control devices and building automation systems.  He serves as a vice chair for the ZigBee Alliance, an alliance of companies that promote wirelessly networked, sensing and control protocol suites.  Plaintiff can attack Kinney's credibility as an expert on cross-examination.

Plaintiff asserts that Kinney's expert report is unreliable on the basis that he failed to consider whether defendants used plaintiff's patented technology.  Plaintiff asserts further that Kinney's opinions invade the province of the jury in evaluating technical documents.

7

Kinney conducted an extensive review and analysis of publically-available information relevant to the major components of Wi-Con, which is geared toward assisting with the factual question of whether plaintiff's Wi-Con technology constituted a novel idea.  Kinney also compared the Wi-Con and wiHUBB systems by reviewing documents, technical specifications, material bills, and physical samples of the components of wiHUBB.  The Court finds that Kinney's analysis of Wi-Con and wiHUBB will assist the trier of fact in assessing the two products and the novelty of the Powerweb technology.  Kinney's opinion is not so unreliable or lacking in quality that it should be precluded or limited.  It will assist the jury in this area of wireless technology that it is not within the realm of common knowledge.

Plaintiff attacks the expert opinion of economist Suzanne Buckley, who has analyzed plaintiff's expert report on lost profits.  Buckley's report offers opinions concerning plaintiff's damages and competition in the lighting control market.  Although she is not a specialist on the lighting controls market, she is an economist with experience in analyzing economic markets and damages in intellectual property and commercial litigation.  The Court finds that Buckley is a competent expert to opine on plaintiff's alleged damages and that her methodology, including her use of Kinney's technical expertise, provides a reliable expert report to assist the jury's consideration. Plaintiff can attack Buckley's credibility and report on cross examination.

The motions in limine will be denied.

### III.  MOTIONS FOR SUMMARY JUDGMENT

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a

matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute.  American International Group, Inc. v. London American International Corp., 664 F. 2d 348, 351 (2d Cir. 1981).  In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  Bryant v. Maffucci, 923 F. 2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991).

The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute.  American International Group, Inc., 664 F.2d at 351. In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party.  Anderson, 477 U.S. at 255.

If a nonmoving party has failed to make a sufficient showing on an essential element of his or her case with respect to which he or she has the burden of proof, then summary judgment is appropriate.  Celotex Corp., 477 U.S. at 323.  If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met.  Anderson, 477 U.S. at 249.

A.    **Motion for Summary Judgment of No Liability**

1.    Contract and Breach of the Covenant of Good Faith and Fair Dealing
      Claims

Plaintiff alleges that defendants breached the agreements pertaining to the use and confidentiality of the information disclosed by plaintiff.  Upon review of the evidence, the Court finds that numerous questions of fact exist concerning the contractual terms, defendants' potential bad faith conduct, the asserted public disclosures, defendants' use of the plaintiff's information, and the amount of information that defendants developed independently.

2.    Unjust Enrichment

Defendants assert that plaintiff cannot recover under a theory of unjust enrichment because the contracts at issue are indisputably valid.  The Court agrees. Lack of a contractual remedy is a "precondition for recovery based upon unjust enrichment."  Gagne v. Vaccaro, 255 Conn. 390, 401 (2001).  Summary judgment will be granted on this claim.

3.    Misappropriation of Trade Secrets

Defendants argue that plaintiff's trade secrets could only have an independent value if they related specifically to Wi-Con's wireless capabilities and that plaintiff has not shown such independent value; defendants also assert that plaintiff failed to maintain the secrecy of its trade secrets.

CUTSA defines a trade secret as: information, including a formula, pattern, compilation, program, device, method, technique, process, drawing, cost data or

10

customer list that: (1) derives independent economic value, actual or potential, from not

being generally known to, and not being readily ascertainable by proper means by,

other persons who can obtain economic value from its disclosure or use, and (2) is the

subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Conn. Gen. Stat. § 35–51(d).  Section 35-51(b) provides that a misappropriation of a

trade secret occurs in the following circumstances:

> (1) Acquisition of a trade secret of another by a person who knows or has
> reason to know that the trade secret was acquired by improper means; or
> (2) disclosure or use of a trade secret of another without express or
> implied consent by a person who (A) used improper means to acquire
> knowledge of the trade secret; or (B) at the time of disclosure or through a
> person who had utilized improper means to acquire it; (ii) acquired under
> circumstances giving rise to a duty to maintain its secrecy or limit its use,
> including but not limited to disclosures made under section 1–210,
> sections 31–40j to 31–40p, inclusive, or subsection (c) of section 12–62;
> or (iii) derived from or through a person who owed a duty to the person
> seeking relief to maintain its secrecy or limit its use; or (C) before a
> material change of his position, knew or had reason to know that it was a
> trade secret and that knowledge of it had been acquired by accident or mistake.

Plaintiff counters that Wi-Con had an economic value deriving from its wireless

capability and, as a whole, based on its capacity to provide an economic advantage.

Elm City Cheese Co. v. Frederico instructs that each piece of information relative to a

product has "value in connection" with other related product information and that

"economic value" of the whole product cannot be "separated from its constituent parts."

251 Conn. 59, 88 (1999).  Thus, plaintiff argues that its alleged trade secrets' economic

value may relate to the product's value as whole rather than only to its wireless

capabilities.  The Court finds that disputed issues of fact exist concerning the economic

value of plaintiff's alleged trade secrets, plaintiff's precautionary efforts to keep its trade

secrets confidential, the extent of any disclosures of such trade secrets, and

11

defendants' actual use of plaintiff's trade secrets.  Accordingly, the Court will leave plaintiff to its proof.

    4.   <u>Misappropriation of Idea</u>

Defendants maintain that summary judgment should enter on plaintiff's claim for misappropriation of idea because plaintiff has failed to assert a concrete and novel idea.

A claim for misappropriation of idea requires that a legal relationship must exist between parties and that the idea is novel and concrete.  <u>Ball v. Hershey Foods Corp.</u>, 842 F. Supp. 44, 47 (D. Conn. 1993). Defendants set forth that plaintiff disclosed its allegedly confidential information in patent filings and the alleged confidential technology has already been the subject of a 2005 trade publication article.  The Court cannot assess on summary judgment the extent that plaintiff disclosed confidential information or the extent that its Wi-Con ideas were already known and disseminated in the 2005 article.  Accordingly, summary judgment will be denied.

    5.   <u>Conversion</u>

Defendants maintain that plaintiff's conversion count must fail because defendants had a license to use plaintiff's confidential information and because plaintiff was never excluded from its own possession of the confidential information.

In order to establish a prima facie case of conversion, the plaintiff must set forth allegations that (1) the moneys and property at issue belonged to the plaintiff, (2) the defendants deprived the plaintiff of those moneys and property for an indefinite period of time, (3) the defendant's conduct was unauthorized, and (4) the defendant's conduct harmed the plaintiff.  <u>Miller v. Guimaraes</u>, 78 Conn. App. 760, 778 (2003).   Conversion

12

occurs when there is an unauthorized assumption and exercise of ownership rights to the exclusion of the owner's rights.  Macomber v. Travelers Property & Casualty Corp., 261 Conn. 620, 649 (2002).

Conversion applies to intangible property rights evidenced in a document.  Hi-Ho Tower, Inc. v. Com-Tronics, Inc., 255 Conn. 20, 44 (2000).  In this instance, the question of whether defendants' use of the confidential information was authorized is dependent upon whether defendants breached the confidential and licensing agreements.  Plaintiff maintains that it disclosed information to defendants according to agreements for joint development and sale of Wi-Con.

However, plaintiff has failed to raise an inference that it was excluded from use of its confidential information.  Plaintiff claims that defendants' conduct effectively drove plaintiff out of business so that plaintiff was not in a position to market its Wi-Con product.  Plaintiff has not argued that it was prevented from using its own information due to any other circumstance than its finances.  However, it does not follow that plaintiff was excluded from access to its confidential information based on its weak financial position.  Plaintiff's complaint against defendants sounds in contract rather than the tort of conversion.  The Court will grant summary judgment on the claim of conversion.

6.     Breach of Fiduciary Duty

Defendants assert that the breach of fiduciary duty claim fails because the parties did not have a fiduciary relationship.  Defendants premise their argument on the equal bargaining power of the parties and the fact that the parties agreed to have an independent contractor relationship.

13

A fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties.  Konover Development Corp. v. Zeller, 228 Conn. 206, 218-19 (1994).  One of the parties to the fiduciary relationship must have superior knowledge, skill or expertise and retain the duty to represent the interests of the other.  Biller Associates v. Peterken, 269 Conn. 716, 723 (2004).  The superior position of the fiduciary or dominant party affords a great opportunity to that party for abuse of the confidence.  Ahern v. Kappalumakkel, 97 Conn. App. 189, 194 (2006).  Connecticut law does not define a fiduciary relationship "in precise detail and in such a manner as to exclude new situations."  Iacurci v. Sax, 139 Conn. App. 386, 401 (2012), cert. granted, 308 Conn. 910 (2013).   Generally, courts have not recognized a fiduciary relationship where the parties were dealing at arm's length or where the parties were not engaged in a relationship of special trust and confidence.

Thus, a breach of fiduciary duty requires proof: (1) That a fiduciary relationship existed which gave rise to (a) a duty of loyalty on the part of the defendant to the plaintiff, (b) an obligation on the part of the defendant to act in the best interests of the plaintiff, and (c) an obligation on the part of the defendant to act in good faith in any matter relating to the plaintiff; (2) That the defendant advanced its own interests to the detriment of the plaintiff; (3) That the plaintiff sustained damages; and (4) That the damages were proximately caused by the fiduciary's breach of duty.  Censor v. ASC Technologies of Connecticut, LLC, 900 F. Supp. 2d 181, 213 (D. Conn. 2012).

Here, the License Agreement provided that each party "will keep the other Party's Confidential Information and all related matters confidential and prevent disclosure of said Confidential Information by its agents, employees or representatives."

14

Thus, construing the inferences of fact in favor of the non-moving party, plaintiff as the disclosing party placed trust and confidence in the party to whom it disclosed its proprietary information.  The Court will leave plaintiff to its proof that a fiduciary relationship existed and that defendants breached a fiduciary duty.

       7.   <u>CUTPA</u>

Defendants assert that plaintiff cannot assert a CUTPA claim because (1) defendants exercise of contractual rights cannot form the basis of alleged unfair conduct; and (2) the alleged conduct in violation of CUTPA did not occur in Connecticut.  Plaintiff maintains that the parties contractually selected Connecticut law and a Connecticut forum applied to any disputes.

As previously discussed, disputed issues of fact exist concerning the question of whether defendants conduct constitutes a valid exercise of contractual rights.

As to defendants' second argument, courts have noted that CUTPA does not require that a violation occur in Connecticut so long as it is tied to a form of trade or commerce intimately associated with Connecticut or where Connecticut law applies according to choice of law principles.  <u>Excelsior Advertising, Inc. v. Abbott</u>, 2007 WL 1875655, *2 (D. Conn. 2007) (citing cases).  However, the Connecticut Appellate Court has recently held (1) that a non-specific contractual term providing Connecticut law as governing the agreement does not compel application of CUTPA to a dispute between the parties, and (2) that CUTPA proscribes only unfair trade practices occurring within Connecticut.  <u>Western Dermatology Consultants, P.C. v. VitalWorks, Inc.</u>, 146 Conn. App. 169, 199 (2013).  The Connecticut Supreme Court has recently granted certiorari on the issue of whether the Appellate Court properly applied the conflict of law analysis

15

and interpreted CUTPA to require that the trade or commerce occur in Connecticut. Western Dermatology Consultants, P.C. v. Vitalworks, Inc., 310 Conn. 955 (2013). Accordingly, the Connecticut Supreme Court's determination of these issues will bear significantly on this Court's ruling on plaintiff's CUTPA claim.  The Court will deny without prejudice defendants' motion for summary judgment on the CUTPA claim.  After the Supreme Court has rendered its decision in Western Dermatology, defendants may file a renewed motion on this claim.

**B.    Motion for Summary Judgment of No Lost Profits**

Defendants argue that plaintiff's claim for lost profits fails because (1) it is based on speculation and conjecture; (2) it lacks a causal link to the alleged misconduct or breach; (3) it is precluded by a contractual limitation of liability clause; and (4) it is not tied to the confidential information that defendants allegedly misused.

In Connecticut, recovery of lost profits as damages for contract, breach of fiduciary duty or tort claims is permissible unless they are too speculative or remote. Levinson v. Westport Nat. Bank, 2012 WL 4490432 (D. Conn. 2012), reconsideration granted on other grounds, 2013 WL 1294473 (D. Conn. 2013).  Lost profits may be calculated based on past profits but a plaintiff cannot recover for the mere potential of profitability.  Beverly Hills Concepts, Inc. v. Schatz and Schatz, 247 Conn. 48, 75 (1998).  A claim for the right to recover is speculative where the calculation of such damages depends upon a contingency that might not happen.  Meadowbrook Center, Inc. v. Buchman, 149 Conn. App. 177, 2014 WL 1282569, *7 (April 8, 2014) (plaintiff's claim for damages was speculative as predicated on an unresolved contingency, the approval of a medicaid application).

16

Evidence concerning lost profits based on past and similar sales can provide a modicum of reliability, although lost future profits cannot be calculated with mathematical certainty.  Message Center Management, Inc. v. Shell Oil Products Co., 85 Conn. App. 401, 421 (2004).

The evidence must afford a sufficient basis for estimating the lost profits with reasonable certainty.  Bridgeport Harbour Place I, LLC v. Ganim, 131 Conn. App. 99, 123 (2011) (lost profits damages could not be based on unfinalized contract as to costs, timetable, and specifications).   "In order to remove the assessment of damages from the realm of speculation, it is necessary to tie the award of damages to objective verifiable facts that bear a logical relationship to projected future profitability."  Beverly Hills Concepts, Inc., 247 Conn. at 69.  Expert opinion must be supported by tangible evidence with a substantial and sufficient factual basis rather than by speculation and hypothetical situations.  Landmark Inv. Group, LLC v. Calco Const. & Dev. Co., 2013 WL 5969076, *19 (Conn. Super. 2013).

In this instance, plaintiff's expert does not base his lost profits analysis on wiHUBB sales even though plaintiff asserts that wiHUBB represents the development of plaintiff's misappropriated information.  Plaintiff's lost profits projections appear to be based on several contingent assumptions such as defendants' actual use and marketing of Wi-Con and gSmart, a Powerweb lighting management software program. Plaintiff's alleged lost profits include anticipated sales of Wi-Con to retrofit all lighting fixtures.  There is no indication that defendants would have taken any of the action to use or market Wi-Con or gSmart as assumed by plaintiff's assessment of lost profits. Without objective verifiable facts to support plaintiff's projected future profits claim, the

17

Court must find that such claim falls within the realm of speculation.  Accordingly, the Court will grant summary judgment on plaintiff's claim for lost profits.

## IV.  CONCLUSION

For the foregoing reasons, the motions in limine (docs. 234 & 235) are DENIED. The motion for summary judgment of no liability (doc. 225) is DENIED in part and GRANTED in part.  The Court grants summary judgment on plaintiff's claims of unjust enrichment and conversion.  The Court GRANTS defendants' motion for summary judgment of no lost profits (doc. 227).

Plaintiff is instructed to file an amended complaint that conforms with this ruling within 5 days of this order's filing date.

Dated at Bridgeport, Connecticut, this _3d__ day of May, 2014.


/s/
Warren W. Eginton
Senior United States District Judge